UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
JANINE NECCI,

                            Plaintiff,          MEMORANDUM & ORDER
                                                16-CV-3250(JS)(ARL)
          -against-

LONG ISLAND RAILROAD COMPANY,

                            Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:      Marc Wietzke, Esq.
                    Flynn & Wietzke
                    1205 Franklin Avenue, Suite 370
                    Garden City, New York 11530

For Defendant:      Brian Kenneth Saltz, Esq.
                    Samuel Veytsman, Esq.
                    The Long Island Rail Road Company
                    Jamaica Station, Mail Code 1143
                    Jamaica, New York 11435


SEYBERT, District Judge:

          Plaintiff Janine Necci ("Plaintiff") filed this action

alleging that defendant Long Island Railroad Company ("LIRR")

violated the employee-protection provision of the Federal Railroad

Safety Act ("FRSA"), 49 U.S.C. § 20109.  Presently pending before

the Court is LIRR's motion for summary judgment.  (LIRR's Mot.,

D.E. 25.)  For the following reasons, LIRR's motion is GRANTED.

BACKGROUND

I.   Factual Background[1]

_____

[1] The following facts are drawn from LIRR's Local Civil Rule 56.1
Statement, (LIRR's 56.1 Stmt., D.E. 25-2); Plaintiff's 56.1
Response (Pl.'s 56.1 Resp., D.E. 26-1, ¶¶ 1-59); and Plaintiff's

A. Plaintiff's Disciplinary History

In August 2005, LIRR hired Plaintiff as a Station
Appearance Maintainer ("SAM"). (LIRR's 56.1 Stmt. ¶ 1.) In 2007,
she became a locomotive engineer, "responsible for the safe and
proper operation of LIRR trains." (LIRR's 56.1 Stmt. ¶ 2.)

Between 2010 and 2012, LIRR disciplined Plaintiff for
five separate instances of misconduct in her duties as a locomotive

---

56.1 Counterstatement, (Pl.'s 56.1 Counterstmt., D.E. 26-1,
¶¶ 60-143). At points in Plaintiff's 56.1 Response, she states
that she "does not have information to either deny or admit
[LIRR's] statement" of fact or "does not have personal knowledge
of" facts. (E.g., Pl.'s 56.1 Resp. ¶¶ 18-19.) In these
instances, the Court deems the correspondingly numbered
paragraphs from LIRR's 56.1 Statement to be admitted. See Local
Civ. R. 56.1(c)-(d).

Additionally, Plaintiff provides that "[i]n the interest of
efficiency," she did not include a statement of facts in her
Opposition. (Pl.'s Opp., D.E. 26, at 3.) Instead, she purports
to "incorporate[ ] by reference the entirety of" her 56.1
Response and Counterstatement as well as "the underlying
affidavits and their exhibits." (Pl.'s Opp. at 3.) While the
Court will consider the facts in her 56.1 Response and
Counterstatement, as well as additional facts in her Opposition
that are supported by citations to evidence, the Court will not
consider any facts located exclusively in exhibits and
affidavits, which exceed 1,100 pages of material. See Local
Civil Rule 56.1.

Moreover, Plaintiff states that "to make particular arguments,"
she incorporated into her Opposition some "specific points" that
are "not intended to be exclusionary." (Pl.'s Opp. at 3.) The
Court notes that Plaintiff filed a fourteen-page brief, and
under the undersigned's individual rules, she was entitled to an
additional eleven pages of briefing. To the extent Plaintiff
provided only examples of the facts and arguments in her favor,
the Court will not make Plaintiff's unbriefed arguments for her.

engineer.[2] (LIRR's 56.1 Stmt. ¶¶ 3-7.) For example, LIRR charged her with violating train operating rules and operating her train at improper speeds on July 27, 2011, resulting in unnecessary train delay. (LIRR's 56.1 Stmt. ¶ 4.) At her deposition, Plaintiff testified that she disagreed with several of the charges. (E.g., Pl.'s Dep., Veytsman Decl. Ex. D, D.E. 25-7, 30:12-16.) Each time, however, she pled guilty to the disciplinary charge, waived her trial and appeal rights, and accepted a penalty of suspension. (LIRR's 56.1 Stmt. ¶¶ 3-7.) Her four sets of charges yielded progressively longer suspensions of twenty days, then thirty-five days, then fifty days, then sixty days. (LIRR's 56.1 Stmt. ¶ 8.)

Plaintiff's Complaint relates to two separate charges: one issued in 2013 for Plaintiff's work as a locomotive engineer, and the other issued in 2016 for Plaintiff's work as a SAM.

B. The 2013 Incident

On June 5, 2013, Plaintiff operated LIRR Train 2716 on a trip from Jamaica Station to Montauk, and the train arrived in Montauk more than fifty minutes late (the "2013 Incident"). (LIRR's 56.1 Stmt. ¶¶ 10-11; Pl.'s 56.1 Resp. ¶ 11.) On June 14, 2013, LIRR served Plaintiff with charges for improper performance of duty, alleging that during the June 5, 2013 trip, she

---

[2] Two of the incidents were addressed in a single charge, so there were four sets of charges for the five incidents. (LIRR's 56.1 Stmt. ¶¶ 4-5.)

(1) "unnecessarily inspected the entire consist, delaying the departure of Train 2716 from Jamaica," (2) "failed to comply with approach and medium clear signals as [she] approached Babylon," (3) "operated at an unnecessary protracted speed" while approaching Bay Shore Station and Islip Station, and (4) "failed to operate Train 2716 in accordance with the speed displayed on the Cab Signal Indicator" while approaching Patchogue, all of which "resulted in unnecessary running lags which significantly contributed to the delay of [T]rain 2716." (LIRR's 56.1 Stmt. ¶ 12; Notice of Investigation, Becker Decl. Ex. F, D.E. 25-19.)

  1.  <u>Facts</u>

On June 5, 2013, Plaintiff was the locomotive engineer on Train 2716. (Pl.'s 56.1 Counterstmt. ¶¶ 77-78.) She and her crew took control of the train from another crew at a secondary track in a train yard near Jamaica Station. (Pl.'s 56.1 Counterstmt. ¶ 78.) Upon taking the train, Plaintiff inspected the "entire consist," or the entire train. (Pl.'s Dep. 54:11-19.) For example, Plaintiff inspected both the lead, east end and tail, west end of the eastbound train, including the "markers"--red, illuminated lights near the back of the train. (Pl.'s Dep. 58:12-16, 60:18-23.) Additionally, according to LIRR's Superintendent of Engine Service Bret Becker, Plaintiff inspected all the train's jumper cables and "went down the entire consist to make sure that everything was secured properly from one end to the other."

(LIRR's 56.1 Stmt. ¶ 19; Becker Dep., Wietzke Aff. Ex. 2, D.E. 26-4, 83:3-19; Becker Decl., D.E. 25-13, ¶ 2.)

Becker testified that there was no reason for Plaintiff to have inspected the entire consist of Train 2716. (Becker Dep. 86:9-15.)

Similarly, according to Thomas McCaffrey, Road Foreman of Engines at LIRR, Plaintiff's inspection was unnecessary. (McCaffrey Dep., Wietzke Aff. Ex. 4, D.E. 26-6, 5:10-15, 60:10-24.) He testified that Plaintiff was required to inspect the exterior of the lead locomotive. (McCaffrey Dep. 62:2-7.) However, while an exterior inspection of the rear car, or "cab car," was required, "it shouldn't have been done by the locomotive engineer," Plaintiff. (McCaffrey Dep. 62:8-63:11.) Further, he believed her "unnecessar[y] inspect[ion] included the following: "she got up on the cab car, she got into the cab car, she looked at the blue sheet, she looked at the certification, she looked at handle positions, she looked at seals, and that was all unnecessary." (McCaffrey Dep. 60:25-61:8.)

The testimony of LIRR's Lead Road Foreman of Engines, Robert Kerr, accords with Becker's and McCaffrey's. (Kerr Dep., Wietzke Aff. Ex. 5, D.E. 26-7, 5:2-3.) According to Kerr, under the circumstances, Plaintiff was "responsible to check the headlights on the leading end of the equipment, the east end. . . . The headlight would be the only thing that we would be checking on

the exterior of the equipment taking over the train on the secondary track." (Kerr Dep. 35:12-36:7.) He provided that Plaintiff, however, "began a locomotive inspection at the west end of the train." (Kerr Dep. 32:13-21.) Kerr attributed four to five minutes of delay to Plaintiff's inspection. (Kerr Dep. 44:12-16.)

Plaintiff denies that locomotive engineers are not responsible for inspecting the backs of trains. (Pl.'s 56.1 Resp. ¶ 9.) She cites McCaffrey's testimony that upon taking a train from another crew, the new crew must perform brake and departure tests, inspect the locomotive, and check components that need to be sealed. (Pl.'s 56.1 Resp. ¶ 9; McCaffrey Dep. 37:16-25, 38:10-21.) Additionally, the train crew is required to "make sure of the proper position [a] blue plug" on the train's cab car. (McCaffrey Dep. 98:15-21.) Plaintiff also cites the testimony of Train 2716's Conductor, Adam Papadoulias, that "marker lights" on both ends of the train--including the rear--must be inspected before the train departs. (Pl.'s 56.1 Resp. ¶ 9; Papadoulias Dep., Wietzke Aff. Ex. 3, D.E. 26-5, 5:16-18, 12:3-13.) In her Counterstatement, Plaintiff also discusses two pages from LIRR's Train Handling Equipment Manual, or "THEM," which provide that engineers must "inspect, test and/or observe . . . [that] marker lights [are] functioning properly." (Pl.'s 56.1 Counterstmt.

¶¶ 83-84; McCaffrey Dep. 92:23-25; THEM Diesel Passenger App'x Pages 8 and 9, Wietzke Aff. Ex. 10, D.E. 26-12, at 8.)

Apart from the "unwarranted inspection of the entire consist," LIRR charged Plaintiff with failing "to comply with approach and medium clear signals as [she] approached Babylon," "operat[ing] at an unnecessary protracted speed" while approaching Bay Shore Station and Islip Station, and failing "to operate Train 2716 in accordance with the speed displayed on the Cab Signal Indicator" while approaching Patchogue. (See Notice of Investigation.) According to McCaffrey, her failure to comply with the "medium clear signal" approaching Babylon caused a two-minute delay. (McCaffrey Dep. 66:20-67:4.) He also testified that the train should have approached Bay Shore and Islip Stations at thirty to forty miles per hour before stopping, but that Plaintiff was operating the train at a speed of less than ten miles per hour, resulting in delays of less than a minute at each approach. (McCaffrey Dep. 53:4-54:19, 67:16-70:6.) He found that the delay was "an indication of improper train handling because the stop was so slow." (McCaffrey Dep. 71:14-20.) Finally, he believed that her failure to operate the train in accordance with the speed displayed on the Cab Signal Indicator delayed the trip by less than a minute. (McCaffrey Dep. 46:13-48:5, 71:24-72:11, 73:4-11.)

Plaintiff highlights several other factors that delayed Train 2716. For instance, Plaintiff testified that the previous crew turned the train over to her crew behind schedule. (Pl.'s Dep. 116:15-117:2.) Additionally, Plaintiff inspected Train 2716's brake slip, which was not completed as required by federal regulations. (Pl.'s 56.1 Counterstmt. ¶¶ 86-90, 100-02, 104.) Because the brake slip was incomplete, the train could not depart until LIRR's Movement Bureau cleared the crew to leave the station. (Pl.'s 56.1 Counterstmt. ¶ 90; Pl.'s Dep. 21:17-18, 165:3-23.) Plaintiff testified to several other issues delaying the train, including incorrect train orders, equipment problems, the issuance of a restricted speed, and children playing at a bridge near the track. (Pl.'s 56.1 Counterstmt. ¶¶ 91, 105-07, 109.)

Kerr agreed that Plaintiff was not responsible for all of Train 2716's delays. (Kerr Dep. 38:17-21.) At LIRR's internal hearing on these charges, discussed below, McCaffrey stated that Plaintiff was responsible for approximately eighteen minutes of the fifty-one-minute delay. (June 2013 Charge Hr'g Tr., Wietzke Aff. Ex. 8, D.E. 26-10, at 218.) James Rod Brooks, LIRR's Chief Transportation Officer, testified that Plaintiff delayed the train by five minutes or less. (LIRR's 56.1 Stmt. ¶ 27; Brooks Dep., Wietzke Aff. Ex. 6, D.E. 26-8, 41:21-42:6.)

2. <u>Proceedings</u>

a. <u>General Procedures</u>

8

According to Brooks and Rose Koven of LIRR's Trial Offices in the Labor Relations Department, after LIRR issues disciplinary charges, an LIRR hearing officer takes a "statement of facts"--a preliminary interview with a potential witness or party where the hearing officer asks questions and tries to gather facts about the incident. (Koven Dep., Wietzke Aff. Ex. 7, D.E. 26-9, 22:10-24; see Brooks Dep. 20:4-17.) A union representative usually attends these interviews "to protect the interest of the organization and employee." (Koven Dep. 24:13-18; see Brooks Dep. 20:8-10.) LIRR records and transcribes the statement of facts.[3] (Koven Dep. 26:7-11.) The charging official then decides whether there is a basis to issue a Notice of Investigation. (Brooks Dep. 20:15-25, 21:6-23.) After issuing a Notice of Investigation, LIRR schedules a trial or investigation. (Brooks Dep. 21:6-20.)

Before trial begins, the hearing officer investigates the incident and gathers information for use at trial, such as "[a]pplicable rules, regulations, surveillance, [and] maps." (Koven Dep. 15:15-16:13.) He or she collects information from different parties, including the employee, the union, LIRR and union witnesses, the charging officer, the charging department, and LIRR departments with material information. (Koven Dep. 16:19-17:2, 18:9-19:21.) The hearing officer provides that information

---

[3] Koven testified that she believes the audio recordings are discarded after being transcribed. (Koven Dep. 26:12-16.)

to the union during trial, but not before trial begins.  (Koven Dep. 17:3-17.)

At trial, LIRR and the union have the right to call witnesses, but the hearing officer decides what evidence will be admitted.  (Brooks Dep. 21:18-23.)  Both the hearing officer and the accused's union representative question witnesses.  (See, e.g., June 2013 Charge Hr'g Tr. at 2, 18.)

After the trial, an LIRR reviewing officer reviews the transcript and exhibits to determine whether LIRR proved the charges.  (Becker Dep. 76:5-20; see Brooks Dep. 22:3-23:14; Koven Dep. 47:19-48:5.)  The accused may appeal a finding of guilt to an LIRR appeal officer.  (See Brooks Dep. 27:13-17.)

b.  LIRR Hearing and Decision

Over the course of eight days in July and August 2013, Koven, then a Manager of LIRR's Trial Offices, conducted a hearing on Plaintiff's June 2013 charges.  (LIRR's 56.1 Stmt. ¶ 14; June 2013 Charge Hr'g Tr. at 1.)  Plaintiff and her union representative were present for all hearing dates, and they called witnesses, took testimony, presented documentary evidence, and made closing arguments.  (LIRR's 56.1 Stmt. ¶ 16.)  According to Koven, she conducted the hearing in the same way she conducts all disciplinary hearings, and she afforded Plaintiff as much or more leeway to introduce witnesses and other evidence as she has for other accused employees.  (Koven Decl., D.E. 25-10, ¶¶ 7-8, 10.)

Plaintiff disputes this, testifying that Koven denied her request to call and question Becker and a "block operator" who handed her train orders during the June 5, 2013 trip. (Pl.'s Dep. 90:18-92:14.)

After the hearing, LIRR presented the full record--including a 390-page, single-spaced transcript and fifty-two exhibits--to Becker for review and adjudication. (LIRR's 56.1 Stmt. ¶ 19.) Becker found that Plaintiff was guilty of all charges. (LIRR's 56.1 Stmt. ¶ 21.) Becker, who had approximately nineteen years of experience operating locomotives, training employees to operate locomotives, and supervising locomotive engineers, concluded that Plaintiff's pattern of improper train performance made her an unfit and dangerous train operator. (LIRR's 56.1 Stmt. ¶¶ 20, 22.) Based on the 2013 Incident and her prior disciplinary record, Becker found that it would be unsafe and irresponsible to allow her to continue to operate trains. (LIRR's 56.1 Stmt. ¶ 22; Pl.'s 56.1 Resp. ¶ 22; Becker Dep. 137:12-25.) Becker chose to disqualify her from the locomotive engineer position, though he could have terminated her employment with LIRR. (LIRR's 56.1 Stmt. ¶ 23.) On August 28, 2013, LIRR issued Plaintiff a Notice of Discipline reflecting Becker's decision, and she was disqualified from the locomotive engineer position. (LIRR's 56.1 Stmt. ¶ 24.) She then continued working for LIRR as a SAM. (LIRR's 56.1 Stmt. ¶ 26.)

Plaintiff raises several issues with her hearing process. (See Pl.'s Opp. at 9-10; Pl.'s 56.1 Counterstmt. ¶¶ 115, 118.) First, testimony at the hearing is not provided under oath. Second, Becker, the reviewing officer who found Plaintiff guilty, testified that he relies on evidence in the record from trial, as well as information from pretrial investigations such as statements of fact, in deciding whether LIRR has proven charges. (Becker Dep. 81:23-82:20.) Third, Becker testified that before LIRR issued the Notice of Investigation against Plaintiff, he spoke about the charges with McCaffrey, a lead investigator on the case. (Becker Dep. 134:2-7.) He asked McCaffrey to prepare an "event recorder download analysis" on Train 2716. (Becker Dep. 134:8-18.) Fourth, before LIRR issued the Notice of Investigation, Becker spoke to Kerr about the overall operation of Train 2716 on June 5, 2013, and he reviewed relevant statements of fact with him. (Becker Dep. 134:23-135:14.) Fifth, before the trial, Becker spoke to Koven about the witnesses and evidence LIRR would introduce at trial and discussed the proposed discipline level with Koven and, possibly, Kerr. (Becker Dep. 135:15-136:18.)

c.    LIRR Appeal

In September 2013, Plaintiff appealed her disqualification to LIRR Chief Transportation Officer Brooks. (LIRR's 56.1 Stmt. ¶ 27.) At that time, Brooks had approximately twenty-three years of experience operating locomotives, training

others to operate locomotives, and supervising locomotive engineers. (LIRR's 56.1 Stmt. ¶ 29.) He reviewed Plaintiff's hearing record and her prior disciplinary record and concluded that she was guilty of all charges stemming from the 2013 Incident. (LIRR's 56.1 Stmt. ¶¶ 28, 30.) He found that her pattern of improper train performance made her an unfit and dangerous train operator, and he concluded that it would be unsafe and irresponsible for LIRR to allow her to continue to operate trains. (LIRR's 56.1 Stmt. ¶ 31.) Accordingly, he upheld Becker's ruling.[4] (LIRR's 56.1 Stmt. ¶ 31.) On October 3, 2013, Brooks issued a letter to Plaintiff's union explaining his decision. (LIRR's 56.1 Stmt. ¶ 32.)

>    d.   Appeal to National Railroad Adjustment Board

On February 6, 2014, Plaintiff, through her union, initiated a second-level appeal with the National Railroad Adjustment Board of the National Mediation Board ("NRAB"), First Division.[5] (LIRR's 56.1 Stmt. ¶ 33.) She submitted the record of the hearing before Koven, as well as extensive briefing, to the

---

[4] Plaintiff cites Brooks' testimony that while he could not remember whether this was true of Plaintiff's appeal, reviewing officer Becker generally "sit[s] in on the review" and the two discuss the case before Brooks issues his findings. (Pl.'s 56.1 Counterstmt. ¶ 118.l.i; Brooks Dep. 49:13-50:11.)

[5] The NRAB is "[a] grievance arbitration tribunal authorized under the Railway Labor Act [ ] to arbitrate any minor dispute in the railroad industry." National Railroad Adjustment Board (NRAB), Practical Law Glossary Item 9-517-3034.

NRAB. (LIRR's 56.1 Stmt. ¶ 34.) On September 18, 2017, her union argued the appeal before the NRAB in Chicago. (LIRR's 56.1 Stmt. ¶ 34.) On February 20, 2018, the NRAB found that LIRR carried its burden in establishing Plaintiff's misconduct, and it upheld her disqualification. (LIRR's 56.1 Stmt. ¶ 35; NRAB Decision, Veytsman Decl. Ex. A, D.E. 25-4, at 6.) The NRAB also found that there were no fatal procedural errors in the disciplinary process and that sufficient evidence supported each of the charges. (NRAB Decision at 6.)

C. The February 11, 2016 Incident

The other disciplinary action at issue stems from Plaintiff's work as a SAM, after she had been disqualified from the locomotive engineer position. LIRR accused Plaintiff of disobeying and refusing to follow direct orders to vacuum and roll up floormats in Jamaica Terminal Station on February 11, 2016 (the "2016 Incident"). (LIRR's 56.1 Stmt. ¶¶ 39, 44.) On February 19, 2016, LIRR served Plaintiff with disciplinary charges for conduct unbecoming an employee, defiance to an LIRR manager, and fail[ure] to comply with an LIRR manager's instruction. (LIRR's 56.1 Stmt. ¶ 44.)

1. Facts

On February 11, 2016, Plaintiff's supervisors directed her to vacuum mats in the lobby area at Jamaica Terminal Station. (LIRR's 56.1 Stmt. ¶ 39.) According to Timothy Hughes, LIRR's

Director of Ticket Selling and Technology, LIRR SAMs routinely use electrical sockets at LIRR stations to vacuum both wet and dry floor mats. (Hughes Decl., D.E. 25-23, ¶¶ 4, 9.) However, citing perceived legal and safety issues with her use of outlets in the public lobby, Plaintiff refused to vacuum the mats. (LIRR's 56.1 Stmt. ¶ 40; Pl.'s 56.1 Resp. ¶ 40.)

Regarding legality, Plaintiff testified that she had only ever vacuumed using outlets in private areas, she believed it was illegal to use outlets in public areas, and she had never seen another cleaner use outlets in Jamaica Terminal Station's public lobby. (Pl.'s Dep. 152:11-153:11, 156:2-157:1.) Concerning safety, she testified that she did not know whether the outlets "functioned very well," and she did not know whether using such an outlet would "possibly cause a fire or possibly [ ] cause the electric to shut down in the station." (Pl.'s Dep. 152:22-153:7.) Additionally, she testified that after the date of the incident, she discovered that the vacuum she was given was "not rated for vacuuming wet rugs," so she "could have been electrocuted."[6] (Pl.'s Dep. 153:8-15.)

---

[6] Plaintiff avers that the floormats were wet, but the testimony she cites does not contain that proposition. (See Pl.'s 56.1 Resp. ¶ 43; Pl.'s Dep. 153:3-11.) However, granting Plaintiff every favorable factual inference, the Court assumes that the floormats were wet during the 2016 Incident.

After she refused to vacuum the floormats, Plaintiff's supervisors instructed her to roll them up and put them away—according to Hughes, a task that SAMs routinely perform. (LIRR's 56.1 Stmt. ¶ 41; Pl.'s Dep. 158:8-19; Hughes Decl. ¶ 9.) Initially, Plaintiff did not comply. (LIRR's 56.1 Stmt. ¶ 42; Pl.'s Dep. 159:9-13.) She testified that she asked her supervisors how heavy the mats were, told them that she had never performed the task, and said that she did not know where the mats were stored or the procedure for transporting them to the storage site. (Pl.'s Dep. 159:13-17.) Plaintiff also testified that she believed that she was not required to do the work because it was the responsibility of a "heavy duty" SAM crew. (Pl.'s Dep. 149:15-150:23.) She acknowledged, however, that this belief was incorrect. (Pl.'s Dep. 150:15-151:1.)

According to Plaintiff, one of her supervisors then asked foreman Anthony Cabrera to show her how to roll the mats. (Pl.'s Dep. 154:9, 159:23-160:6.) She did not perform the task, however, because his instruction did not address her concerns that the mats were heavy and that she did not know where or how to move them. (See Pl.'s Dep. 159:23-160:13.) Plaintiff testified that Cabrera then called another SAM, Jay Kessler, to assist her. (Pl.'s Dep. 160:10-13.) At that point, Plaintiff "stated she would no longer take part in the conversation and walked away" because she was waiting for her union representative to arrive. (Pl.'s

Dep. 160:22-161:5.)  However, she testified that while she was
waiting, she noticed that Kessler "had already put a lot of the
rugs into the barrel."  (Pl.'s Dep. 161:5-7.)  She walked to where
he was working, put one rug into the barrel, then accompanied him
downstairs where he showed her the mats' storage location.  (Pl.'s
Dep. 161:7-11.)

Plaintiff testified that next, one of the supervisors--
Assistant Terminal Manager John Persico--asked her to speak with
him and Cabrera.  (Pl.'s Dep. 148:7-8; Pl.'s Dep. 161:11-15.)
According to Plaintiff, she refused because she was still waiting
for her union representative.  (Pl.'s Dep. 161:11-15.)  Persico
followed her to the lobby exit and again asked her to come to his
office, but she walked away and resumed cleaning.  (Pl.'s Dep.
161:16-24.)

2.  Proceedings

a. LIRR Hearing and Decision

On April 11 and May 18, 2016, Koven, then the Senior
Manager of LIRR's Trial Offices, conducted a hearing on Plaintiff's
February 2016 charges.  (LIRR's 56.1 Stmt. ¶ 45; Feb. 2016 Charge
Hr'g Tr., Koven Decl. Ex. B, D.E. 25-12, at 1.)  Plaintiff and her
union representative were present for both hearing dates, and they
called witnesses, took testimony, presented documentary evidence,
and made closing arguments.  (LIRR's 56.1 Stmt. ¶ 47.)  In her
declaration, Koven provides that she conducted the hearing in the

same way she conducts all disciplinary hearings and that she allowed Plaintiff as much or more leeway to introduce witnesses and evidence as she has for any other accused employee. (Koven Decl. ¶ 16.) However, Plaintiff points out that Koven did not allow Plaintiff to ask certain questions, including forbidding her from asking Persico the question "do you think that vacuums can cause fires?" (Pl.'s 56.1 Resp. ¶ 46; Feb. 2016 Charge Hr'g Tr. at 52.)

LIRR presented the full record of the hearing, including a 128-page, single-spaced transcript and thirty-one exhibits, to Hughes for review and adjudication. (LIRR's 56.1 Stmt. ¶ 49.) At the time, Hughes had approximately twenty-six years of experience working in LIRR's Stations Department, including as a SAM. (LIRR's 56.1 Stmt. ¶ 50.) He had never met Plaintiff and had no knowledge of the circumstances surrounding her disqualification from the locomotive engineer position. (LIRR's 56.1 Stmt. ¶ 50.) He found her guilty of all charges, concluding that she willfully disobeyed and refused to follow multiple direct orders to perform her job. (LIRR's 56.1 Stmt. ¶ 51.). On June 1, 2016, LIRR issued a Notice of Discipline terminating Plaintiff's employment with LIRR. (LIRR's 56.1 Stmt. ¶ 52.)

b.    Appeal to National Mediation Board

In October 2016, Plaintiff, through her union, appealed her termination to the National Mediation Board ("NMB").[7] (LIRR's 56.1 Stmt. ¶ 53.) Plaintiff's union selected neutral NMB Arbitrator Michael Capone to hear and decide the appeal. (LIRR's 56.1 Stmt. ¶ 54.) In addition to submitting extensive briefing and the record of the hearing before Koven, Plaintiff's union presented oral argument in support of the appeal. (LIRR's 56.1 Stmt. ¶ 55.) On November 29, 2017, Capone issued the NMB's decision upholding LIRR's finding that Plaintiff was guilty of all charges. (LIRR's 56.1 Stmt. ¶ 56.) Specifically, Capone found that Plaintiff "engaged in conduct unbecoming an employee" and that her affirmative defenses concerning legality, safety, and whether heavy duty SAMs were supposed to perform the work were not supported by sufficient evidence. (NMB Decision, Veytsman Decl. Ex. B, D.E. 25-5, at 6-9.) However, he found that the penalty of termination was excessive and that Plaintiff "should be afforded a last chance to keep her job," so he "restored [her] to service without back pay for all time out of service." (LIRR's 56.1 Stmt. ¶ 57.)

---

[7] The NMB is "[a]n independent federal agency charged with administering the Railway Labor Act (RLA). The NMB's primary duties [include, among other things] . . . [m]ediating collective bargaining disputes, also known under the RLA as minor disputes." National Mediation Board (NMB), Practical Law Glossary Item 6-517-3021.

Effective December 29, 2017, LIRR reinstated Plaintiff to the SAM position. (LIRR's 56.1 Stmt. ¶ 58.) Within a week of being reinstated, Plaintiff bid for and received the position of Ticket Clerk-Customer Service, which provided a twenty-four percent pay increase over her earnings as a SAM. (LIRR's 56.1 Stmt. ¶ 59.)

## II. Procedural History

Plaintiff commenced this action on June 17, 2016, alleging that she engaged in the following protected activities under the FRSA: (1) performing a safety inspection on June 5, 2013 and reporting "safety inspection certifications that were not in compliance with FRA [(Federal Railroad Administration)] requirements"; (2) reporting that "train orders were not properly prepared, presenting a separate safety issue"; and (3) slowing "her train in response to a safety hazard reported to her and report[ing] back that [LIRR] had improperly characterized where the safety hazard was." (Compl., D.E. 1, ¶ 10.) She claims that LIRR "took adverse or unfavorable actions against [her] in whole or in part due to her protected activities when it charged [P]laintiff with company rule violations in connection therewith and denied her promotion opportunities as a result of the protected activity, as well as demoting and ultimately terminating her." (Compl. ¶ 12.)

Plaintiff purports to assert two separate causes of action, but her Complaint primarily discusses the 2013 Incident (and associated charges) and discusses the 2016 Incident only insofar as it resulted in her employment being "ultimately terminat[ed]." (See generally Compl.) Accordingly, the Court construes the Complaint to allege that LIRR retaliated against her by decertifying her as a locomotive engineer after the 2013 Incident and firing her after the 2016 Incident. For relief, Plaintiff seeks "expungement of all references to disciplinary action related to the incident of March 24, 2010"[8]; lost benefits and wages, with interest; compensatory damages for economic losses; compensatory damages for mental anguish and emotional distress; punitive damages; and "special damages for all litigation costs including expert witness fees and attorney fees." (Compl. at 4.) She also demands judgment against LIRR of $450,000 on the first cause of action and $450,000 on the second cause of action. (Compl. at 4.)

LIRR answered the Complaint on July 15, 2016. (Answer, D.E. 6.) On October 3, 2017, this case was stayed pending the resolution of the NRAB and NMB arbitrations, discussed above, and

---

[8] The Court assumes that Plaintiff meant "the incident of June 5, 2013," since the parties do not discuss any incidents that occurred on March 24, 2010.

it was reopened on February 26, 2018.  (See Oct. 3, 2017 Elec. Order; Feb. 26, 2018 Elec. Order.)

On June 28, 2018, LIRR filed a fully briefed motion for summary judgment.  (LIRR Br., D.E. 25-1; Pl.'s Opp.; LIRR Reply, D.E. 27.)

DISCUSSION

## I.   Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio

22

v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. FRSA Retaliation

The FRSA's purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To facilitate that purpose, the FRSA prohibits railroad carriers from retaliating against employees who engage in certain safety-related protected activities. See id. § 20109. As recently summarized by the Second Circuit, the employee-protections section of the FRSA, 49 U.S.C. § 20109,

> prohibits covered employers from discharging, demoting, or in any other way discriminating against employees who engage in certain protected activities. Broadly, the substantive provisions of § 20109(a)[ ] [and]

23

> (b)[9] . . . bar retaliation against workers
> who:
>
> - report wrongdoing, §§ 20109(a)(1),
>   (a)(3)-(7), (b)(1)(A);
> - refuse to violate federal law,
>   § 20109(a)(2); [or]
> - decline to work in unsafe conditions,
>   §§ 20109(b)(1)(B)-(C) . . . .

Metro-N. Commuter R.R. Co. v. U.S. States Dep't of Labor, 886 F.3d 97, 106 (2d Cir. 2018); see also 49 U.S.C. § 20109(d)(3) (creating private right of action).

FRSA retaliation claims are evaluated under the burden-shifting test of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B). 49 U.S.C. § 20109(d)(2)(A)(i); see Tompkins v. Metro-N. Commuter R.R., No. 16-CV-9920, 2018 WL 4573008, at *5 (S.D.N.Y. Sept. 24, 2018), appeal filed, 2d Cir. Case No. 18-3174. Under this test, the "plaintiff must first make a prima facie showing by a preponderance of the evidence 'that (1) [the plaintiff] engaged in protected activity; (2) the employer knew that [the plaintiff] engaged in the protected activity; (3) [the plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" Tompkins, 2018 WL 4573008, at *5 (alterations in original) (quoting Hernandez v.

---

[9] Plaintiff's Complaint does not specify which subsections of the FRSA LIRR allegedly violated, but in her Opposition, she clarifies that she believes subsections (a)(1), (a)(2), and (b) apply. (Pl.'s Opp. at 3-4.)

*Metro-North Commuter R.R.*, 74 F. Supp. 3d 576, 579 (S.D.N.Y. 2015)). If the plaintiff makes the required showing, "'the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" Id. (quoting *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017), appeal filed, 2d Cir. Case No. 17-2725).

## A. The 2013 Incident

As discussed, Plaintiff alleges in her Complaint that she engaged in three protected activities on June 5, 2013. (See Compl. ¶ 10.) First, referring to her report of defective brake slips, she avers that she engaged in protected activity by inspecting Train 2716 and reporting "safety inspection certifications that were not in compliance with FRA requirements." (Compl. ¶ 10; see Pl.'s 56.1 Counterstmt. ¶¶ 86-90, 100-04.) Second, referring to her receipt of incorrect "Form L train orders," she claims that "[s]he further engaged in protected activity when she reported that the train orders were not properly prepared." (Compl. ¶ 10; see Pl.'s 56.1 Counterstmt. ¶ 91.a; Papadoulias Dep. 24:14-26:6.) Third, referring to an ambiguity in the reported location of a "bridge strike" and restricted-speed zone, Plaintiff alleges that "she engaged in protected activity when she slowed her train in response to a safety hazard reported to her and reported back that [LIRR] had improperly characterized

where the safety hazard was." (Compl. ¶ 10; see Pl.'s 56.1 Counterstmt. ¶¶ 106-07, 109; Papadoulias Dep. 30:13-32:12.) LIRR does not dispute that these activities are protected under the FRSA.[10] (See LIRR Br. at 11-12.) Thus, there is no dispute that Plaintiff has established the first element of her prima facie case.

Additionally, LIRR does not dispute that it knew she engaged in those activities and that she suffered an unfavorable personnel action when she was decertified as a locomotive engineer--the second and third elements of her prima facie case. (LIRR Br. at 8-9.)

LIRR argues that her case fails on the fourth element, because her protected activities were not contributing factors in her decertification. (LIRR Br. at 9-12.) The Court agrees.

"[A] contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" Kuduk v. BNSF Ry. Co., 768 F.3d 786,

---

[10] LIRR clarifies that the charges it issued did not include any reference to these protected activities. (LIRR Br. at 11-12 n.5.) The Court concurs. LIRR did not charge Plaintiff with performing a safety inspection, as Plaintiff maintains in her Opposition. (Pl.'s Opp. at 5 ("The charges themselves cite plaintiff's train inspection as the basis for demoting her.").) Rather, the only reasonable reading of the notice of investigation is that LIRR charged her with performing an inspection incorrectly. (Notice of Investigation (charging Plaintiff with "unnecessarily inspect[ing] the entire consist" of Train 2716") (emphasis added).)

791 (8th Cir. 2014) (quoting Procedures for the Handling of Retaliation Compls. under the Fed. R.R. Safety Act, 75 Fed. Reg. at 53,524). While "under the statute's 'contributing factor' causation standard, '[a] prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive,'" "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." Id. (quoting Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010)) (alteration in original) (additional citations omitted). "[C]ourts considering FRSA claims have held that 'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'" Tompkins, 2018 WL 4573008, at *6 (quoting Kuduk, 768 F.3d at 792). The Court must evaluate evidence of the employer's nonretaliatory reasons for the adverse employment action when considering this element. Id. (quoting Gunderson v. BNSF Ry. Co., 850 F.3d 962 (8th Cir. 2017)).

Using the framework recently employed by the Southern District of New York in the FRSA retaliation case Tompkins v. Metro-North Commuter Railroad, the Court will analyze whether Plaintiff has established that her protected activities contributed to LIRR's disciplinary action against her. Tompkins, 2018 WL 4573008. In Tompkins, Judge Oetken weighed five factors relevant to whether the plaintiff's protected activity was a

contributing factor in the unfavorable personnel action. Id. at *7 (citing Gunderson, 850 F.3d at 969). Specifically, the Tompkins Court discussed an Eighth Circuit decision that upheld the summary judgment dismissal of a plaintiff's FRSA claim because "'five highly relevant facts'" demonstrated that the required causal connection was missing:

> First, the disciplinary investigations that led to [plaintiff's] discharge were completely unrelated to his protected activity. Second, [plaintiff's] prior safety-related activities were remote in time and disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action. . . . Third, [plaintiff] was discharged after disciplinary hearings at which he was represented by union counsel, and the decisions to discharge were upheld by [the railroad] internally and by a[n] . . . arbitration panel. Fourth, the merits of the discharge were again reviewed in a six-day hearing before a [Department of Labor administrative law judge]. . . . Fifth, the decision to discharge was made by [a railroad division manager] after consulting with his supervisors and with [railroad] human relations officers, not by . . . the lower-level supervisors [plaintiff] accuses of safety-related bias.

Id. (quoting Gunderson, 850 F.3d at 969) (alterations in original).

The Tompkins Court found that the first two factors weighed in the plaintiff's favor, the fourth factor was inapplicable because the Department of Labor had not completed its investigation into the plaintiff's petition, and the third and fifth factors weighed in the railroad's favor. Id. It noted that

"'[a]n intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.'" Id. (alteration in original) (quoting Nolley v. Swiss Reinsurance Am. Corp., 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012)). The court granted the railroad summary judgment because even though the first two factors favored the plaintiff's case, there was "no evidence showing that it was not the [unprotected behavior] which formed the sole basis of [ ] disciplinary proceedings against" him. Id.

### 1. Gunderson's Contributing Factor Considerations One, Two, Four, and Five

Here, the factors fall in the same directions they did in Tompkins. Like in Tompkins, "Gunderson factors one and two--which concern the temporal and substantive connection between an FRSA plaintiff's protected conduct and subsequent adverse employment action"--favor Plaintiff. See id. LIRR charged and disciplined Plaintiff for misconduct resulting in delays on the June 5, 2013 trip to Montauk, and Plaintiff contends that her protected activities caused further delays on that trip. Thus, the protected activities were "close in time and similar in subject matter to the disciplinary charges" and her resulting decertification from the locomotive engineer position. See id.

The Court notes, however, that Plaintiff's protected activities were not part of the charges lodged against her.[11]

Additionally, as in <u>Tompkins</u>, the fifth <u>Gunderson</u> factor weighs in LIRR's favor.[12]  Plaintiff points to no evidence that "any of the lower-level supervisors accountable for addressing [Plaintiff's] safety complaints [on June 5, 2013] played a decision-making role in the adjudication of the charges against [her]."  <u>See</u> <u>id.</u>

Before reaching the third factor, the Court also notes that LIRR decertified Plaintiff as a locomotive engineer and reinstalled her as a SAM, rather than firing her.  This further erodes the inference of a causal connection between Plaintiff's protected activities and the unfavorable action.

    2.   The NRAB's Decision and Gunderson's Contributing Factor Consideration Three

---

[11] Plaintiff does not address this point in her Opposition, but in her 56.1 Counterstatement, she claims that McCaffrey testified "that he had taken issue with [ ] [P]laintiff reporting the brake test slip and inherently with the delay it caused."  (Pl.'s 56.1 Counterstmt. ¶ 101 (citing June 2013 Charge Hr'g Tr. at 32).)  While the page of the hearing transcript she cites does not contain that testimony, the Court's review of the surrounding pages shows that McCaffrey testified that he felt it was "unnecessary [for her] to check the air brake card" in the first place, not that he took issue with her reporting its deficiencies.  (June 2013 Charge Hr'g Tr. at 33-34.)  Accordingly, this is not evidence that the charges included (or were motivated by) Plaintiff's protected activity.

[12] Also like in <u>Tompkins</u>, the fourth factor is inapposite since the Department of Labor never completed its investigation into Plaintiff's complaint to the Occupational Safety and Health Administration ("OSHA").  (Compl. ¶¶ 13-14.)

The parties dispute whether the LIRR hearing yielded a fully developed and untainted record and whether the Court should give weight to the NRAB's decision, which is based on that record. Specifically, Plaintiff relies on Grimes v. BNSF Railway Co., 746 F.3d 184 (5th Cir. 2014), to argue that procedural issues at LIRR's hearing, decision, and appeal stages tainted the record before the NRAB, and by extension, the NRAB's decision. (See Pl.'s Opp. at 8-11.) In Grimes, the district court gave collateral estoppel effect to an arbitrator's finding of fact that was relevant to the plaintiff's FRSA claim, and it granted summary judgment to the defendant railroad on that basis. Grimes, 746 F.3d at 186. The Fifth Circuit held that "because it was the railroad that conducted the investigation and hearing and terminated [the plaintiff], and because the [arbitration board] only reviewed a closed record, the procedures were not adequate for collateral estoppel to apply." Id. at 190. Accordingly, it vacated the order granting summary judgment and directed the district court, on remand, to "decide for itself whether there is a genuine issue of material fact for trial, granting only as much deference to the arbitral finding of fact as is consistent with [ ] principles" discussed in the opinion.[13] Id. at 190-91.

_____

[13] Plaintiff misstates this holding, asserting that the Grimes Court found "the arbitration decision [to be] inadmissible as unreliable." (Pl.'s Opp. at 8.)

Citing <u>Collins v. New York City Transit Authority</u>, 305
F.3d 113 (2d Cir. 2002), LIRR contends that the Court should give
weight to the NRAB's decision and decide that Plaintiff's protected
activities were not a contributing factor in Plaintiff's
unfavorable personnel action.[14]  (LIRR Br. at 9-12.)  In <u>Collins</u>,
the Second Circuit held that "[w]here an employee's ultimate
termination depends upon, and is allowed by, a decision of an
independent and unbiased arbitrator based on substantial evidence
after a fair hearing, the arbitration decision has probative weight
regarding the requisite causal link between an employee's
termination and the employer's illegal motive." <u>Collins</u>, 305 F.3d
at 115.

---

[14] Plaintiff argues that <u>Collins</u> is inapposite for two reasons.
<u>First</u>, Plaintiff notes that <u>Collins</u> is a Title VII case and
maintains that the FRSA's "retaliation standard" "is much more
lenient and employee friendly."  (Pl.'s Opp. at 8.)  However,
Plaintiff supports this proposition by citing to <u>Kuduk</u>, 768 F.3d
at 790, which does not aid her argument.  In <u>Kuduk</u>, the Eighth
Circuit affirmed the grant of summary judgment to the defendant
railroad, noting that while a plaintiff need not "conclusively
demonstrate the employer's retaliatory motive" to establish
causation, he or she must still prove "intentional retaliation
prompted by the employee engaging in protected activity."
<u>Kuduk</u>, 768 F. 3d at 791-92 (internal quotation marks and
citations omitted).  In any event, the Court is not persuaded
that a more lenient causation standard takes this case outside
<u>Collins</u>' ambit.  <u>Second</u>, Plaintiff contends that "[t]he FRSA
standard for retaliatory adverse action is much broader even
than the expansive . . . Title VII standard."  (Pl.'s Opp. at 8-
9.)  However, this argument relates to the scope of the FRSA's
unfavorable personnel action requirement, an element not in
dispute.  Thus, Plaintiff's arguments are unavailing.

In light of the parties' arguments, the Court must analyze Plaintiff's disciplinary process to resolve the third <u>Gunderson</u> factor--whether Plaintiff "'was discharged after disciplinary hearings at which [s]he was represented by union counsel, and the decisions to discharge were upheld by [the railroad] internally and by a[n] . . . arbitration panel'"--and to determine what weight to give the NRAB's decision. <u>See Tompkins</u>, 2018 WL 4573008, at * 7 (quoting <u>Gunderson</u>, 850 F.3d at 969) (second, third, and fourth alteration in original).

Here, as detailed above, Plaintiff was represented by her union at an LIRR hearing that lasted eight days and yielded a 390-page, single-spaced transcript with fifty-two exhibits. (<u>See generally</u> June 2013 Charge Hr'g Tr.) Koven allowed Plaintiff "to admit into evidence each and every document she proffered at her 2013 disciplinary hearing." (Koven Reply Decl., D.E. 27-1, ¶¶ 5-6.) Plaintiff's union representative questioned witnesses at the hearing before Koven, and he and Plaintiff gave closing arguments. (LIRR's 56.1 Stmt. ¶ 16; <u>see generally</u> June 2013 Charge Hr'g Tr.) A different LIRR officer, Becker, then reviewed the record. (LIRR's 56.1 Stmt. ¶ 19.) He found that Plaintiff was responsible for the charged conduct and decertified her from the locomotive engineer position. (LIRR's 56.1 Stmt. ¶¶ 21-23.) Plaintiff appealed Becker's decision to a third LIRR officer, Brooks, who upheld Becker's findings and discipline. (LIRR's 56.1 Stmt. ¶¶ 27-

31.) Plaintiff then presented the record, extensive briefing, and oral argument to the NRAB on a second-level appeal. (LIRR's 56.1 Stmt. ¶¶ 33-34.) The NRAB found sufficient evidence to support the charges against Plaintiff. (NRAB Decision at 6.) It also found that Plaintiff's "misconduct consisted of more than just the unnecessary delay of the train" and that "[d]isqualification from the position of Locomotive Engineer . . . [wa]s consistent with the nature of [Plaintiff's] misconduct and her previous disciplinary record." (NRAB Decision at 6.)

While Plaintiff does not argue that the NRAB was anything but impartial, she stresses that her employer, and not a neutral arbitration panel, conducted her evidentiary hearing. (See Pl.'s Opp. at 7-10). She complains that the LIRR hearing process placed her at an "insurmountable disadvantage" before the NRAB because Koven impeded her attempt to show that the charged misconduct was not the only source of Train 2716's delays. (Pl.'s Opp. at 7-10; Pl.'s 56.1 Counterstmt. ¶ 96.)

Plaintiff's grievance is factually unfounded. First, the hearing transcript contains Plaintiff's questions and lengthy arguments about additional delays during the June 5, 2013 trip. (E.g., June 2013 Charge Hr'g Tr. at 107, 128, 144-45, 382-89.) Second, Koven herself asked McCaffrey how much of the delay was caused by the conduct with which Plaintiff was charged, and McCaffrey estimated "[a]pproximately 18 minutes." (June 2013

Charge Hr'g Tr. at 210.) Third, the NRAB's decision discusses the delays that Plaintiff claims the panel was not able to review. (NRAB Decision at 3.) Fourth, the argument that Koven was biased against Plaintiff was raised before and rejected by the NRAB. (NRAB Decision at 2, 6.) Thus, the record before the NRAB contained evidence and argument that events other than the charged misconduct contributed to Train 2716's delays.

Plaintiff raises other perceived flaws in the disciplinary process, but she fails to show that they resulted in prejudice to her or an incomplete or tainted record before the NRAB. First, citing no evidence to support her position, she argues that she was prejudiced by her inability to question Becker, who "turned out to be the impetus for the charges in the first place, to have coordinated with [the] hearing officer and witnesses and then ultimately to be the person who reviewed the transcript for guilt or innocence." (Pl.'s Opp. at 9.) The NRAB considered and rejected this exact argument. (NRAB Decision at 2, 6.) Moreover, Koven's refusal to allow Plaintiff to call Becker as a witness caused her no prejudice, as there is no indication that he was involved in or had firsthand knowledge of the events of June 5, 2013. Second, Plaintiff takes issue with Koven's practice of meeting with company witnesses and reviewing evidence before the hearing. (Pl.'s Opp. at 9.) However, even if Koven did so here, Plaintiff does not contend that it prevented her and her union

representative from exploring a range of issues in their questioning of witnesses, introduction of evidence, and development of the record. A review of the hearing transcript shows that Koven provided Plaintiff great latitude in questioning witnesses, even when she believed the questions to be irrelevant. (E.g., June 2013 Charge Hr'g Tr. at 171.) Third, Plaintiff avers that Koven "testified not having the expertise to determine if a delay of a locomotive was reasonable or not." (Pl.'s Opp. at 9.) This is immaterial because Koven conducted Plaintiff's hearing; she did not decide whether LIRR proved the charges. Fourth, miscellaneous complaints in Plaintiff's 56.1 Counterstatement (which she does not raise in her Opposition) concern issues with Becker's conduct. (See supra § I.B.2.b.) However, Becker was the reviewing officer, not the officer responsible for conducting the hearing. Thus, Becker's actions did not affect Plaintiff's ability to develop the record. Finally, the NRAB considered Plaintiff's many procedural objections and found that "there were no fatal procedural errors. In reaching this conclusion, the [NRAB] has taken into account all procedural claims raised by [Plaintiff's union]. None of them, either alone or taken together, point to any prejudice that was caused [ ] [Plaintiff]." (NRAB Decision at 2, 6.)

The NRAB's decision is also supported by the evidence.[15] McCaffrey, Becker, and Kerr testified that Plaintiff inspected the entire consist of Train 2716 when she was not supposed to do so. (McCaffrey Dep. 60:25-61:8, 62:2-63:11; Becker Dep. 86:9-15; Kerr Dep. 32:13-21, 44:12-16.) In her 56.1 Response (but not her Opposition), Plaintiff points to McCaffrey's and Papadoulias' testimony that the crew is responsible for certain exterior inspections of the locomotive, implying that Plaintiff's inspection was necessary. (Pl.'s 56.1 Resp. ¶ 9.) However, testimony about the entire crew's responsibilities does not conflict with the testimony that the locomotive engineer-- Plaintiff--should not have been the member of the crew performing the inspection. (McCaffrey Dep. 62:8-63:11.) Moreover, without context or argument that it applied to this situation, Plaintiff submits two isolated pages of the THEM for the proposition that Plaintiff was required to inspect the "marker lights" on the rear car of Train 2716. (Pl.'s 56.1 Counterstmt. ¶¶ 83-84.) But even if Plaintiff were required to do so, she does not underline

_____

[15] The evidence before the Court on summary judgment is substantially the same as that before the NRAB. And notably, in her Opposition, Plaintiff does not highlight evidence showing that she was innocent of the charged misconduct. (See generally Pl.'s Opp.) In fact, she acknowledges that she delayed Train 2716, even though she notes that different witnesses disagreed about how substantially she delayed it. (Pl.'s Opp. at 5.)

evidence contradicting the testimony that other aspects of her inspection were unnecessary. (E.g., McCaffrey Dep. 60:25-61:8.)

Additionally, Plaintiff does not highlight evidence undermining the remaining charges--failing "to comply with approach and medium clear signals," operating "at an unnecessary protracted speed," and failing "to operate Train 2716 in accordance with the speed displayed on the Cab Signal Indicator." (Notice of Investigation.) Even though there was "no correct speed" at which Plaintiff should have approached train stations, McCaffrey testified that Plaintiff was operating the train too slowly, which was an "indication of improper train handling." (Pl.'s 56.1 Counterstmt. ¶ 111; McCaffrey Dep. 69:8-71:22.) The NRAB agreed, noting that the evidence showed that Plaintiff proceeded at a "crawl" and that her "misconduct consisted of more than just the unnecessary delay of the train." (NRAB Decision at 6.) And regarding her failure to operate at the speed displayed on the Cab Signal Indicator, McCaffrey testified that while safety equipment was malfunctioning at the time of the incident, that would "[n]ot necessarily" require Plaintiff to slow the train.[16] (Pl.'s 56.1 Counterstmt. ¶ 112; McCaffrey Dep. 96:21-98:7.)

---

[16] In any event, the Court does "'not sit as a super-personnel department that re-examines an employer's disciplinary decisions.'" Gunderson, 850 F.3d at 969 (quoting Kuduk, 768 F.3d at 792). That is, in evaluating whether Plaintiff's protected activities were a contributing factor in the unfavorable employment action, the "critical inquiry" "'is not

Considering the above, _Gunderson_ factor three favors LIRR.

Additionally, for the same reasons, the NRAB's decision "attenuate[s] [ ] [P]laintiff's proof" that her protected activities and LIRR's decision to discipline her were causally linked. See _Collins_, 305 F.3d at 119. In _Collins_, the Second Circuit held that:

> a decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where . . . that decision follows an evidentiary hearing and is based on substantial evidence, the . . . plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact--e.g. new evidence not before the tribunal--or that the impartiality of the proceeding was somehow compromised.

_Id._ Here, in a decision supported by substantial evidence, the NRAB found that Plaintiff was guilty of misconduct and that she should be disqualified as a locomotive engineer. LIRR conducted

---

whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" _Id._ (quoting _McCullough v. Univ. of Ark. for Med. Scis._, 559 F.3d 855, 861-62 (8th Cir. 2009)). The NRAB's findings and the evidence discussed in this Memorandum and Order establish a good-faith basis for LIRR's belief that she was guilty of the charged misconduct. See _id._ at 969-70 (citing _Richey v. City of Independence_, 540 F.3d 779, 784 (8th Cir. 2008)). Therefore, even assuming LIRR mistakenly (but in good faith) believed that Plaintiff violated train operating rules, liability would not attach unless Plaintiff could demonstrate that her protected activities influenced LIRR's decision.

Plaintiff's evidentiary hearing, and the Court--like the NRAB--finds that Plaintiff suffered no prejudice as a result. Plaintiff has not raised any persuasive evidence that the NRAB's decision was "wrong as a matter of fact . . . or that the impartiality of the proceeding was somehow compromised." See Collins, 305 F.3d at 119. Therefore, while the NRAB's decision does not preclude Plaintiff's FRSA claim, it has probative weight in establishing that the charged misconduct--and not Plaintiff's protected activities--motivated LIRR's disciplinary action. See Rommage v. MTA Long Island R.R., No. 08-CV-0836, 2010 WL 4038754, at *11-13, *15-16 (E.D.N.Y. Sept. 30, 2010) (applying Collins to an LIRR disciplinary proceeding where the plaintiff appealed to a neutral arbitrator and granting LIRR's motion for summary judgment on the plaintiff's race and gender discrimination claims and retaliation claim), aff'd, 452 F. App'x 70 (2d Cir. 2012); see also Grimes, 746 F.3d at 190-91; Morel v. Am. Bldg. Maint. Co., 124 F. App'x 671, 672 (2d Cir. 2005).

### 3. Balancing the Gunderson Factors

To summarize, LIRR disciplined Plaintiff after she engaged in misconduct, as well as protected activities, during the 2013 Incident.[17] There is no direct evidence that LIRR retaliated

---

[17] As discussed above, even if Plaintiff did not engage in misconduct, LIRR had a good-faith basis for believing that she did. See supra note 16.

against her, but the temporal and substantive proximity between the protected activities and the disciplinary action (<u>Gunderson</u> factors one and two) may create a weak inference of causation. However, any such inference is erased by (1) the NRAB's finding, after a thorough hearing and appeal process, that Plaintiff was responsible for the charged misconduct (<u>Gunderson</u> factor three), since the misconduct is "'[a]n intervening event between the protected activity and the adverse employment action [that] may defeat the inference of causation,'" <u>Tompkins</u>, 2018 WL 4573008, at *7 (quoting <u>Nolley</u>, 857 F. Supp. 2d at 461); (2) there has been no showing that the lower-level supervisors responsible for resolving the safety issues Plaintiff reported were decisionmakers in her disciplinary process (<u>Gunderson</u> factor five); and (3) the fact that LIRR did not fire Plaintiff, but decertified her as a locomotive engineer and reinstalled her as a SAM, after her sixth incident of misconduct as a locomotive engineer.  Thus, the Court concludes that Plaintiff has failed to adduce sufficient evidence to support a jury finding that any of her protected activities-- and not solely her charged misconduct--were a contributing factor in the unfavorable personnel action.[18]   See <u>Tompkins</u>, 2018 WL

---

[18] For the reasons discussed in this section, even assuming Plaintiff has established a <u>prima facie</u> case of retaliation, LIRR has shown by clear and convincing evidence that it would have taken the same action in the absence of Plaintiff's protected activities.

4573008, at *7 (granting summary judgment to railroad where first and second Gunderson factors favored plaintiff, third and fifth factors favored railroad, and plaintiff "produce[d] no evidence showing that it was not the [unprotected misconduct] which formed the sole basis of th[e] disciplinary proceedings against him"); cf. Dendy v. Nat'l R.R. Passenger Corp., No. 14-CV-8381, 2016 WL 3198304, at *1 (S.D.N.Y. June 8, 2016) (denying defendant railroad's motion for summary judgment on FRSA retaliation claim where there was testimony that plaintiffs suffered adverse employment action after being threatened with demotion unless they agreed to report fewer safety defects). Accordingly, with respect to Plaintiff's claims arising out of the 2013 Incident, LIRR's motion for summary judgment is GRANTED.

B.   The February 2016 Incident

Plaintiff satisfies the third element of her prima facie case with respect to the 2016 Incident:  She suffered an unfavorable personnel action when LIRR fired her for refusing to vacuum or roll up floormats while working as a SAM (though she was reinstated after her NMB hearing). However, the remaining elements of whether Plaintiff engaged in a protected activity, whether LIRR knew she did so, and whether the protected activity was a contributing factor in the adverse employment action require further discussion.

1.   Protected Activities

As discussed above, there is no dispute that Plaintiff's reports of safety issues on June 5, 2013--which are the only protected activities alleged in her Complaint--are protected under the FRSA. However, LIRR argues that Plaintiff improperly attempts to amend her Complaint by alleging in her Opposition that the following activities during the 2016 Incident are also protected: (1) "question[ing] whether a vacuum not rated to handle wet floor mats was safe to use"; (2) refusing to vacuum "using a covered outlet which she believed to be illegal"; and (3) initially refusing the request to move "heavy wet mats" because of safety concerns. (Pl.'s Opp. at 5-6, 11-12; LIRR's Reply at 5-6.)

To the extent Plaintiff makes such an attempt, it fails. Initially, "[a] party may not use . . . her opposition to a dispositive motion as a means to amend the complaint," and the Court will not allow Plaintiff to do so here. Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007). Additionally, on the merits, the activities are not protected under the FRSA.

First, Plaintiff's questioning of "whether a vacuum not rated to handle wet floor mats was safe to use" is not protected. (See Pl.'s Opp. at 5.) Significantly, it is based on a faulty factual premise, as Plaintiff testified that she discovered the vacuums were not rated for wet floor mats only after the incident. (Pl.'s Dep. 153:8-15.) Capone noted the same deficiency to this theory when Plaintiff raised it with the NMB, remarking that

43

Plaintiff's "credibility is less than trustworthy" because she raised her safety concerns for the first time at her hearing before Koven and "did not reference 'wet mats' when she refused to vacuum." (NMB Decision at 7-8.) Thus, Plaintiff's refusal to vacuum could not have been driven by her concern over the vacuum's alleged unsuitability for wet floor mats.

Even overlooking the chronological flaw in Plaintiff's argument, her refusal to vacuum is not protected under 49 U.S.C. § 20109(b)(1)(B). To establish that a refusal to work is protected under this provision, a plaintiff must demonstrate that "a reasonable individual in the circumstances then confronting [her] would conclude that [ ] the hazardous condition present[ed] an imminent danger of death or serious injury." 49 U.S.C. § 20109(b)(2)(B)(i). This requirement "'contains both subjective and objective components,'" and "[o]bjective reasonableness in such a case is 'based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'" Hernandez, 74 F. Supp. 3d at 580 (quoting Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221 (2d Cir. 2014)). Plaintiff has not shown the objective reasonableness of her fear that using electrical outlets would have resulted in a fire, an electrical failure, or the electrocution of herself or others. (Pl.'s Dep. 152:22-153:15.) To the contrary, Hughes testified that SAMs routinely

44

vacuum both wet and dry floormats at LIRR stations and regularly use electrical sockets at stations to power the vacuums. (Hughes Decl. ¶ 9.) Thus, her refusal based on her alleged concern that using an unfamiliar outlet would cause a catastrophe was not reasonable or protected. See 49 U.S.C. §§ 20109(b)(1)(B), (b)(2)(B)(i); Tompkins, 2018 WL 4573008, at *5-6 (granting summary judgment in favor of railroad where FRSA plaintiff's refusal to perform job was not objectively reasonable).

Second, Plaintiff's belief that using the outlets would have been illegal does protect her refusal to vacuum. Initially, 49 U.S.C. § 20109(a)(2) protects against refusals to violate "Federal laws, rules, and regulations" regarding railroad safety and security. A review of the record reveals that Plaintiff believed the outlets violated the New York Codes, Rules and Regulations ("NYCRR"), not any federal provision. (NMB Decision at 8.) Additionally, Plaintiff offers no evidence or argument that her use of the outlets would actually have violated the NYCRR. In the NMB's decision, Capone also noted this issue, providing that "[t]here is a lack of sufficient evidence that supports [ ] [Plaintiff's] misguided conclusions that it was illegal to use the outlets in the Jamaica Station lobby . . . . [Plaintiff's] assertion of illegality does not suffice. Her personal interpretation of rules and regulations cannot be a reason for the

[LIRR] to accept her refusal to perform her job." (NMB Decision at 7-8.)

Third, Plaintiff's initial refusal to move floormats because she did not know how heavy they were is not protected under 49 U.S.C. § 20109(b)(1)(B). As discussed above, an employee's refusal to work under this provision is protected only if it was objectively reasonable for her to believe that "the hazardous condition present[ed] an imminent danger of death or serious injury." 49 U.S.C. § 20109(b)(2)(B)(i). Hughes testified that SAMs, like Plaintiff, routinely put away floormats. (Hughes Decl. ¶ 9.) Plaintiff also testified that another employee lifted and loaded the mats into a barrel, and that she eventually lifted one mat and put it into the barrel. (Pl.'s Dep. 161:5-11.) Additionally, Plaintiff presented this argument to the NMB, and Capone found Plaintiff's safety concerns to be unsupported by the record. (NMB Decision at 9.) Plaintiff points to no evidence suggesting that her concern about the floormats' weight (and her implied concern that she might be seriously injured if she lifted the mats) was objectively reasonable, and her refusal is unprotected. 49 U.S.C. §§ 20109(b)(1)(B), (b)(2)(B)(i).

Because Plaintiff did not engage in protected activities during the 2016 Incident, the Court will analyze whether LIRR's decision to discipline her was in retaliation for her protected activities during the 2013 Incident.

2. Contributing Factor

Even assuming Plaintiff can satisfy the employer-knowledge requirement by showing LIRR's general corporate knowledge of her protected activities in 2013, see Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116-17 (2d Cir. 2000)), Plaintiff cannot establish that her protected activities were a contributing factor in LIRR's decision to discipline her. The Court will again turn to the Gunderson framework to analyze this element.

Under Gunderson factor one, the disciplinary action arising out of Plaintiff's duties as a SAM during the 2016 Incident were "completely unrelated to [Plaintiff's] protected activit[ies]" in her capacity as a locomotive engineer in June 2013. See Gunderson, 850 F.3d at 969 (internal quotation marks and citation omitted). Under factor two, the disciplinary proceedings were "remote in time" from the protected activities, commencing nearly three years after Plaintiff reported safety issues in June 2013. See id. (internal quotation marks and citation omitted). Further, the protected activities were "disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action"-- Plaintiff's charged misconduct on February 11, 2016. See id. Under Gunderson factor five, Hughes made the disciplinary decision, not "the lower-level supervisors [Plaintiff] accused of safety-related bias" during the 2013 Incident. See id. At the

time Hughes reviewed the hearing record and found her guilty of the charges, he had never met Plaintiff and had no knowledge of the circumstances surrounding her disqualification from the locomotive engineer position. (LIRR 56.1 Stmt. ¶ 50.) Additionally, as with the 2013 Incident, Gunderson factor four is inapplicable, and the third Gunderson factor (regarding Plaintiff's hearing and appeal process) requires further analysis.

Here, Koven conducted a two-day evidentiary hearing on the charges, at which Plaintiff and her union representative called and questioned witnesses, presented evidence, and made closing arguments. (LIRR's 56.1 Stmt. ¶¶ 45, 47.) The hearing generated a 128-page, single-spaced transcript and thirty-one exhibits. (LIRR's 56.1 Stmt. ¶ 49.) Hughes reviewed the record and found Plaintiff guilty of conduct unbecoming an employee, defiance to an LIRR manager, and failing to comply with an LIRR manager's instructions, and he terminated her employment with LIRR. (June 2016 Notice of Discipline, Hughes Decl. Ex. B, D.E. 25-25.)

On appeal to the NMB, Plaintiff and her union submitted the entire hearing record, extensive briefing, and oral argument to Arbitrator Capone. (LIRR's 56.1 Stmt. ¶¶ 53-55.) Plaintiff argued that she did not vacuum or roll up the floormats because she was concerned about the safety and legality of those actions, and Capone found the concerns to be unfounded. (NMB Decision at 5-9.) Capone ruled that Plaintiff "failed to perform her duties

as instructed" and that Plaintiff "engaged in conduct unbecoming an employee when she first refused to vacuum the mats in the Jamaica Station lobby and again later when directed to roll them up." (NMB Decision at 6-7, 9.) However, he found that "the penalty of dismissal [ ] is excessive and [ ] [Plaintiff] should be afforded a last chance to keep her job. [ ] [Plaintiff] is restored to service without back pay for all time out of service." (NMB Decision at 9-10.)

Plaintiff does not argue that Capone was biased, but citing no evidence in support, avers that she "was precluded from introducing evidence [at the hearing before Koven], such as the section of the New York Code that prohibited the use of public outlet [sic] in the manner that she was being asked to use it." (Pl.'s Opp. at 9.) This statement is factually incorrect. First, Koven allowed Plaintiff to introduce into evidence "each and every document she proffered at her 2016 disciplinary hearing," including printouts of NYCRR provisions that she claimed forbade her use of the outlets in Jamaica Station. (Koven Reply Decl. ¶ 3; 2016 Hr'g Ex. List, D.E. 27-2; NYCRR Printouts, D.E. 27-3 (listing "Westlaw [NYCRR]" provisions as exhibits).) Second, a review of the hearing transcript shows that Plaintiff introduced those exhibits, explained her belief that her use of public outlets would have violated the NYCRR, and questioned witnesses about the documents. (Feb. 2016 Charge Hr'g Tr. at 43-49, 51-52.) Third,

Capone considered and rejected Plaintiff's contentions. (NMB Decision at 3, 8 (noting that while Plaintiff misidentified the NYCRR as the "MTA Penal Code" in arguing that it prohibited her from using outlets in Jamaica Station, "Plaintiff does not provide any verifiable support for how the outlets violated the NYCRR.").) Thus, Plaintiff's complaint about her inability to introduce evidence is unsupported by the record.

Moreover, the NMB's decision upholding the charges is supported by substantial evidence. See Collins, 305 F.3d at 115. In her Opposition, Plaintiff does not argue that the charges were unsubstantiated, but contends that:

> There is [a] dispute as to whether she refused to roll up and store the floor mats. Plaintiff states that she asked for instruction on how to do the task, and once she received it, she went ahead and completed it. Defendant alleges that the plaintiff flat out refused to do the work. This is a pure issue on credibility, one only proper for a jury to decide upon.

(Pl.'s Opp. at 6.) Plaintiff's argument is unavailing. As detailed in Section I.C.1, Plaintiff testified that she initially refused to roll up the floormats for a variety of reasons, including that moving the mats was not part of her job responsibilities, she did not know how heavy they were, and she did not know how to perform the task. While she also testified that she assisted with one mat when her coworker had nearly

completed the task, that action does not erase her initial, unprotected refusal. (Pl.'s Dep. 161:5-11.)

Considering the above, <u>Gunderson</u> factor three weighs in LIRR's favor. Because all applicable <u>Gunderson</u> factors undermine Plaintiff's argument that her protected activities were a contributing factor in LIRR's decision to discipline her, the Court finds that Plaintiff cannot establish the causation element of her <u>prima</u> <u>facie</u> case: There is no evidence that her protected activities, rather than solely the charged misconduct, contributed to LIRR's decision. See <u>Tompkins</u>, 2018 WL 4573008, at *8.

Additionally, under <u>Collins</u>, the NMB's decision upholding the charges attenuates any inference that Plaintiff's protected activities on June 5, 2013 contributed to LIRR's decision to discipline her for the 2016 Incident.[19] The NMB evaluated the arguments Plaintiff makes here, and Plaintiff submits no persuasive evidence that the decision was "wrong as a matter of fact . . . or that the impartiality of the proceeding was somehow compromised." See <u>Collins</u>, 305 F.3d at 119.

---

[19] Even if any of the three claimed bases for Plaintiff's refusals to work on February 11, 2016 were protected under the FRSA, for the reasons discussed in this section, the Court would still find that (1) the other unprotected activities independently justified the disciplinary action, (2) the NMB's decision attenuates any inference that the protected activities were a contributing factor in the discipline, and (3) LIRR has shown by clear and convincing evidence that it would have taken the same employment action if Plaintiff had not engaged in the protected activities.

Accordingly, with respect to Plaintiff's claims arising out of the 2016 Incident, LIRR's motion for summary judgment is GRANTED.

## CONCLUSION

For the foregoing reasons, LIRR's summary judgment motion (D.E. 25) is GRANTED. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     March ___21___, 2019
           Central Islip, New York